Clifton DAVIS, Plaintiff–Appellee,

v.

YAZOO COUNTY WELFARE DEPARTMENT, Defendant–Appellant.

No. 90–1185.

United States Court of Appeals, Fifth Circuit.

Sept. 10, 1991.

Robert E. Sanders, Sp. Asst. Atty. Gen. and Mike Moore, Atty. Gen., Jackson, Miss., for defendant-appellant.

Jim Brantley and John S. Knowles, III, Jackson, Miss., for plaintiff-appellee.

Before WISDOM, KING and BARKSDALE, Circuit Judges.

KING, Circuit Judge:

The Yazoo County Welfare Department appeals from a finding of sexual discrimination made by the district court in favor of plaintiff-appellee Clifton Davis in a Title VII failure to hire case. Finding clear error in what appears to be the crucial basis for the district court's finding of discrimination, we vacate and remand for reconsideration.

## I. Background

In August 1987, two positions for an eligibility worker[1] opened up in the Yazoo County Welfare Department (the Department). Plaintiff-appellee Clifton Davis, a thirty-three year old black male, applied for one of these positions. Davis satisfied the minimum objective requirements for this position, namely, completion of two years of college in an accredited college or university.

Forty-one other qualified individuals applied for one of the positions. Given the relative timing of the job openings and the application submissions, twenty-seven of the forty-one, as well as Davis, were considered for the second position.[2] Thalia Blain, Director of the Department, interviewed each of the candidates for the position. After the interviews, Blain selected Gloria Owens, a black female, for the first position, and Janice Reed, a white female, for the second. She forwarded these recommendations to the State Personnel Board, which formally hired the two recommended candidates.

In September 1987, a position as a child support enforcement officer[3] opened up in the Department. Blain posted vacancy notices that described the position and the minimum requirements. Eleven qualified individuals, including Davis, applied for this position. The eleven consisted of eight females (five black, three white) and three black males. A black female, Dorothy McCoy, was selected for this position. Also in September, another position as an eligibility worker opened up in the Department. The Department considered the twenty-six remaining applicants[4] carried over from the August application submissions. In addition, the Department considered applications from nine new applicants—all female. Blain recommended, and the Department hired, Sammie Stuart, a black female.

Davis filed a complaint with the Equal Employment Opportunity Commission, alleging that the Department refused to hire him because he was black and because he was male.[5] After receiving a right to

---

1. An "eligibility worker" determines the initial and continuing eligibility of applicants for, and recipients of, welfare assistance.

2. Of the twenty-eight applicants common to both positions, twenty-three were females (twenty black, three white), and five (including Davis) were black males. Of the thirteen additional applicants for the first position, twelve were black females and one was a white female.

3. A child support enforcement officer investigates complaints concerning failures to pay child support. The officer works closely with attorneys in the Department to enforce the laws pertaining to child support. To be considered for the position, a candidate must have either a bachelor's degree from an accredited college or university, or a combination of high school di-

ploma (or GED) and sufficient related work experience.

4. The other two of the twenty-eight applicants considered for both of the August positions were the individuals hired for those positions.

5. Commentators have argued that black males should constitute a separate class, distinct from either males or blacks, in Title VII analysis. *See* Note, *Invisible Man: Black and Male Under Title VII,* 104 Harv.L.Rev. 749, 750 (1991); *see also* Shoben, *Compound Discrimination: The Interaction of Race and Sex in Employment Discrimination,* 55 N.Y.U.L.Rev. 793 (1980). We decline to comment in this case on whether black males represent a protected subclass, because our review is limited to the findings of the district court. The district court in this case found only sexual discrimination.

sue letter, Davis instituted this action against the Department alleging racial and sexual discrimination in violation of Title VII.

The Department contends that its hiring decisions were based on the relative credentials of the applicants and on their ability, as demonstrated in their interviews, to perform successfully in the jobs for which they applied. Blain testified, specifically, that she was unimpressed with the presentation of information on, and the physical condition of, Davis' application. She stated, for example, that Davis' application was torn when presented to her, and had tape and three white-outs on it. She also stated that Davis failed to list his employment history in reverse chronological order, as instructed on the form. Moreover, she was not favorably impressed by his comportment during the interview; for example, he slouched and wore sunglasses.

## II. *Standard of Review*

In a Title VII action that has been fully tried on the merits, such that the district court has before it all the necessary evidence to make the ultimate finding of discrimination, the factual inquiry is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). On review, this court must therefore decide whether the ultimate finding of discrimination by the district court was clearly erroneous. *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United*

*States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## III. *The District Court's Findings*

The district court decided in favor of Davis and held that the Department had sexually discriminated against him in violation of Title VII. The linchpin of the district court's ultimate finding was its decision to credit the testimony of Davis and his sister over the contradictory testimony of Blain. A careful reading of the district court's opinion, however, persuades us that the logic of this decision was fundamentally flawed. As the court stated, it "might be persuaded by th[e] testimony" of Blain regarding the superior presentation of the hirees' applications over that of Davis as evidence of legitimate, non-discriminatory factors that would account for the decisions and insulate the Department from liability.[6]

The district court then stated: "However, there's a crucial piece of evidence which undermines this entire structure of proof and convinces this Court to find for the Plaintiff." The crucial piece of evidence referred to by the district court concerned two telephone conversations—one between Blain and Davis' sister; the other between Blain and Davis. Davis' sister testified that on September 8, Blain called, asked for Davis who was not at home, and left a message "that he ha[d] the child support job" and should "come by or call [Ms. Blain] as soon as possible." Davis testified that upon receipt of this message, he called Blain. She was not in, so he called again on the morning of September 9. According to his testimony, when he reached Blain on September 9, she stated: "oh, yeah, Clifton, we looked at your application, we seen that you already gone by the school and got your paralegal certificate and we want you to know that we have already considered you for the posi-

---

**6.** As the district court stated: "According to Ms. Blain, the director, she was unimpressed with the condition of Plaintiff's application, with the white-outs therein, and with Plaintiff's bearing and appearance during the interview. She stated that during the interview Plaintiff slouched and kept on dark sunglasses. Ms. Blain further testified that all four hirees acquitted themselves in a manner superior to that of the Plaintiff. According to Ms. Blain, the four hirees expressed themselves better, displayed more enthusiasm, and showed a greater affinity for following instructions and handling detailed applications."

tion of child enforcement officer and you got the job, come in on the ... first of October."

According to Blain's testimony, she called Davis[7] in order to find out whether he desired a separate interview for the child support enforcement position. As she explained: "I had interviewed him—I called him to tell him that I had received his child support enforcement officer position [application], and the purpose of my talking with him was to see whether or not he wanted to come back for another interview or whether or not the first interview would stand." She stated that in her conversation with him on September 10, she told him "that he would be given consideration without having to have another face-to-face interview." On September 11, Blain sent a rejection letter to Davis. As she stated, she thought that she had made a fair assessment of the situation, because she "gave [Davis' application] serious thought between the two time periods involved."

This court must give "due regard ... to the opportunity of the trial court to judge of the credibility of the witnesses" and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R.Civ.P. 52(a). In this case, however, the district court made a credibility determination based upon an erroneous perception that a logical inconsistency existed in Blain's testimony.[8] Specifically, in describing the "crucial piece of evidence" on which it relied, the district court referred to a logical inconsistency between Blain's account of her own words in the September 10 telephone conversation and her subsequent actions. As the court stated:

[Ms. Blain] claims that she but called to advise Plaintiff that he was under consideration. Then, she says, on the very next day she wrote Plaintiff a rejection letter. The Court fails to understand under Ms. Blain's version why she would need to call Plaintiff to offer this encouragement when she had testified that during the interview phase she found him wanting in posture and lacking in neatness and detail. .

The court infers from this perceived inconsistency that the purpose for the phone call must have been to offer Davis the position, and that her initial impressions of him at the interview must have been—contrary to her testimony—rather favorable. Thus, the court concludes that Blain must have been "impressed with Plaintiff's credentials and later decided not to hire him upon further reflection," implying that illegitimate considerations caused Blain to change her mind.

We find that the district court clearly erred by failing to acknowledge or account for Blain's testimony that the purpose of her call was to determine whether Davis wanted to go through another interview. We agree that if Blain had indicated in testimony that the essential purpose of her call was to advise Davis that he was still under consideration, as the district court suggests, and we, like the district court, accepted that testimony[9] *arguendo*, this would raise doubts as to the credibility of her earlier assertions that she was unimpressed by his interview. In other words, it would be questionable that Blain would call Davis merely to "offer ... encouragement," when she knew that among the many factors that she would consider in making her final evaluation[10] was a rela-

---

7. Blain testified that she spoke with Davis' sister on September 9 and spoke with Davis on September 10.

8. We note that an inconsistency exists in the testimony of Davis and his sister. Davis' sister stated that after receiving Blain's telephone call, she went to find Davis, who then called Blain and was offered the position that same day. Davis, on the other hand, testified that he was not able to reach Blain on the day that his sister received the call, and was not actually offered the position until the following day.

9. As a starting point for its analysis, the district court appears to have accepted Blain's version of the conversation with Davis (that she apprised him that he would be given consideration without having to have another face-to-face interview).

10. Blain testified that she "use[s] the application itself [and] the interview with the person, ... the work experience, ... [and the] transcripts and evaluate[s] the four and make[s] [her] selection...."

tively unfavorable interview. In that case, we would certainly defer to the credibility determination of the district court.

We recognize that the district court is in a unique position to assess credibility. In making our decision, however, we have access to the transcript, which the district court generally does not have in making its decision. After a careful review of the transcript, we do not agree that a logical inconsistency exists between what Blain *actually* testified to—that she called regarding the issue of a second interview—and her unfavorable impression as to certain aspects of Davis' candidacy. In stating that "she but called to advise Plaintiff that he was under consideration" and "to offer this encouragement," the district court appears in our view to have either overlooked or misapprehended a critical part of Blain's testimony. Although Blain indeed testified that she told Davis that he was under consideration, the *reason* for her call, as she also stated, was to find out whether he wanted another interview. We find nothing illogical or inconsistent about a prospective employer calling a job candidate (about whom the employer has some reservations) regarding the possibility of a second interview when that candidate is entitled as a matter of procedure to such interview.[11]

We reiterate that the court found Blain's testimony, comparing the qualifications of the applicants and finding Davis' qualifications inferior, to be "persua[sive]." We also emphasize that the district court's ultimate finding for Davis was based upon one "crucial piece of evidence," in the absence of which it "might [have] be[en] persuaded by [Ms. Blain's] testimony." We question whether the district court would have found for Davis if it had factored into the

analysis the testimony that her *purpose* for calling was to ascertain whether a second interview would be required.[12]

## IV.  *The Record Evidence*

Our review of the evidence in its entirety reinforces our concerns about the district court's ultimate finding of discrimination. The district court was apparently influenced, in part, by the fact that "few men had ever worked at the Yazoo County Welfare Department," and that the one male who has been continuously employed there "for most of the last five years" works as a supervisor rather than as a clerical worker. The record reflects, however, that over a period of approximately five years, twenty-one vacancies have existed in the positions at issue in this case. From the pool of qualified individuals who applied for those positions, 11.9% were males and 9.5% of hires[13] were male. The Supreme Court recently held, in a racial discrimination case, that the relevant statistical comparison, for purposes of identifying hiring practices that discriminate by having a disparate impact on white and nonwhite applicant groups, is between the percentage of qualified nonwhite applicants and the percentage of selected nonwhite applicants of the total applicant pool. The Court stated: "As long as there are no barriers or practices deterring qualified nonwhites from applying for [the relevant] positions, ... if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642,

---

11. We infer from the record that as a matter of ordinary procedure, the Department grants an automatic interview to every job applicant.

12. We note, furthermore, that even if an offer *was* made and Blain subsequently changed her mind, this would not indicate the existence of sexual discrimination. Apparently, the district court has assumed that the alleged change of mind would more likely be the result of an illegitimate influence, such as sexual discrimination, than the result of an objective reevalua-

tion of legitimate factors in the hiring decision. We find no support, either intuitively or in the record, for this assumption.

13. We note that the 9.5% figure reflects the hiring of two males, the second of whom was not hired until June 1988, two months after Davis filed this action. The percentage, therefore, may be somewhat misleading. We recognize, however, that the statistical sample may be too small to be meaningful.

653, 109 S.Ct. 2115, 2123, 104 L.Ed.2d 733 (1989).

Based on the *Wards Cove* analysis, the relevant comparison in this case is clearly between the percentage of qualified male applicants of the entire applicant pool and the percentage of male hires from that pool. Finding that the latter percentage is not "significantly less" than the former, we are not persuaded that the statistical evidence bolsters the district court's decision. Davis has not, moreover, adduced evidence demonstrating that the paucity of male *applicants* may be attributed to any policy of discrimination at the Department.

The record also reflects that, although Davis met the educational requirements for the positions, the women that were ultimately selected for the positions demonstrated superior communicative skills and greater professionalism in their interviews. Blain testified that eligibility workers are responsible for handling "a volume of paperwork related to establishing initial and/or continuing eligibility for [the] clients." She noted that professional handling of the paperwork is important, because "we're just in a paperwork jungle at the Welfare Department and locating and finding documentation with ease ... is ... essential." With respect to communication skills, she stated that "[a] person must communicate and must have the capability of ... working with people on a one-to-one basis and it goes hand-in-hand with getting information so that we can establish eligibility." She stated that, in evaluating applicants, she would attach more importance to the ability to communicate and process information than to the applicants' transcripts or specific work history.

Blain stated that if the paperwork of the Department were in the "state" of Davis' application, "it would present a problem," among other things, "to the supervisor who was reviewing the case." She had "some

degree of concern," moreover, because Davis kept sunglasses on during the interview, such that she could not gauge by means of eye contact whether he understood her comments. She also testified that he was not particularly responsive to her questions.[14]

The hires, by comparison, demonstrated greater professionalism and communicative skills than Davis. Janice Reed, for example, was "most responsive" to Blain's questions, and convinced Blain that "she enjoyed working with [people], [and] she understood people...." Moreover, "she was well organized" and persuaded Blain that, based upon past experience in which she "routinely handled three assignments simultaneously," she was capable of "master[ing] time management." "She communicated tremendously well" and her application was "orderly."

Gloria Owens also demonstrated greater professionalism and interpersonal skills than Davis. According to Blain, Owens "is a very professional person." "She has a very professional appearance," "she [is] an outgoing person," and "[s]he communicate[s] well." Her application was "[v]ery accurate" and "[n]eat."

Blain testified that Dorothy McCoy, who was promoted from within the Department and whose work habits and skills were known, "is extremely skilled in getting facts from people and she is one who gets documentation in record time." According to Blain, "[w]hen work is presented to her, she goes on and follows through, and when she puts it aside she has done all of the work that she needed to do on that case...." She "sets schedules for herself well," and "her time management and her work skills [are] very adequate." Sammie Stuart, finally, was "very easy to communicate with," "is out-going" and conveyed during the interview that she "likes people." She looked "very professional" for

---

**14.** Blain's impressions of Davis were corroborated by Kathy Bowden, an eligibility worker at the Department who assisted Davis when he once applied for benefits. Bowden testified that Davis did not communicate very effectively, and that "[i]t took a while" to get the information that she needed. She stated that when she found that Davis was applying for a position as an eligibility worker, she "didn't think that he could fill out the forms and get an application approved as an [eligibility worker]" and communicated to Blain that she "just didn't think that he would be a good [eligibility worker]."

the interview and conducted herself professionally.

## V. *Conclusion*

We have set out at some length the record evidence bearing on the existence of sexual discrimination in the Department's decisions not to hire Davis. In our view there is compelling evidence, in an admittedly cold record, that those decisions were not motivated by any proscribed intent. But because the district court saw the witnesses and heard the evidence, we remand the case to the district court with instructions to reconsider its prior conclusions in the light of this opinion.

VACATED and REMANDED with instructions. Each party shall bear its own costs.