# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

—————————

m 99-60289

—————————

YVONNE E. VANCE,

Plaintiff-Appellee,

VERSUS

UNION PLANTERS CORPORATION, ET AL.,

Defendants,

UNION PLANTERS BANK, NATIONAL ASSOCIATION,

Defendant-Appellant.

—————————

Appeal from the United States District Court
for the Northern District of Mississippi

—————————

April 25, 2000

Before DAVIS, CYNTHIA HOLCOMB HALL,[*] and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Yvonne Vance sued Union Planters Bank, N.A. ("Union Planters"), under title VII, alleging discriminatory failure to promote on the basis of sex. A jury awarded $30,000 for lost wages and benefits, $20,000 for emotional distress, and $390,000 in punitive damages. The district court later reduced the total amount awarded to $330,000 because of title VII's statutory limits on employer liability. Union Planters appealed, asserting that (1) no reasonable jury could have found sex

[*] Circuit Judge of the Ninth Circuit, sitting by designation.

discrimination, (2) the court erred in allowing the jury to hear evidence that Union Planters had previously been found to have violated the Equal Pay Act, and (3) the district court erroneously determined Union Planters's size for purposes of the statutory liability limits. We affirm with regard to the first two issues and vacate and remand on the third issue.

I.

Vance had been president of the Oxford, Mississippi, branch of Grenada Sunburst Bank for seven years when the cause of action arose. She performed energetically and successfully in her capacity as branch president and was familiar with the Oxford financial market. Union Planters Corporation, which owned, *inter alia*, First National Bank of New Albany and United Southern Bank, agreed in July 1994 to purchase Grenada Sunburst Bank effective December 31, 1994.

Pursuant to a reorganization plan, Union Planters Corporation announced that it would consolidate its area banks into Union Planters Bank of Northeast Mississippi, N.A. The new bank would be headed by Pat Davis, who previously had been president of First National Bank. Because United Southern and Grenada Sunburst had bank branches in Oxford, the two branches were to be consolidated. Davis was charged with hiring a president for the newly consolidated bank branch.

Vance promptly applied for the job, as did Hardy Farris, the president of the United Southern branch in Oxford. Farris, though, had opted to participate in an early retirement scheme from which Union Planters Corporation refused to release him, making Vance the only viable candidate. Davis met with Vance and asked for hiring recommendations from people in the banking community. Vance's supervisor,

Jimmy Brown, gave her a glowing recommendation and told Davis he should immediately hire her to lead the new bank.

Instead, Davis approached Ed Neelly, who was now working for the Grenada Sunburst branch in Tupelo, and offered him the job. Neelly declined and recommended that Davis hire Vance, with whom Neelly had worked for years. Davis told Neelly that he was looking to hire a "mature man." In response, Neelly recommended Tom Carroll as an effective second-in-command at the new bank. Brown also recommended Vance over Carroll. Davis then offered the branch presidency to Butch Collums, who had worked under Davis at First National Bank; Collums rejected the offer.

Davis claims then to have contacted Pete Boone, the former CEO of Grenada Sunburst Bank. Boone denies he was ever contacted, and testified that had he been, he strongly would have recommended Vance over Carroll. Davis contacted Boone's successor, Don Ayres, who, though he testified that he barely knew Vance, recommended hiring Carroll over Vance. Davis then interviewed Carroll, whose job at Grenada Sunburst had been eliminated during that bank's reorganization; Carroll expressed interest in the branch presidency. Davis hired Carroll on March 15, 1995, and offered Vance the number two position, which she declined. Vance resigned and accepted the number two job at the Bank of Mississippi branch in Oxford, where she soon rose to the position of branch president.

Vance testified that, as a result of her failure to receive the Union Planters branch presidency, she lost between $7,500 and $8,000 in bonuses and $4,050 in § 401(k) contributions. She claimed also to have lost $3,500 in annual pay in her new job and

2

incurred $15,000 to $16,000 in health expenses because of an inability to obtain insurance upon transferring firms. A psychologist who examined Vance and interviewed her friends, testified that her failure to receive the promotion caused her to suffer from depression, agitation, sadness, and shock.

At trial, Vance's counsel asked Davis why he continued to solicit male candidates for the branch presidency when it appeared that Vance was the only qualified applicant. Davis replied that he wanted to hire the "the best guy, the best person, and I saying [sic] that generically." Also at trial, the court denied Union Planters's motion in limine to prevent Vance from asking Davis any questions about previous adjudications in which he was determined to have unlawfully discriminated against women by paying them less than men. The court told Vance's counsel: "You may ask him if he had ever been found to have discriminated against women in this work place as far as pay is concerned without going into the details or the name of a case or anything." Vance asked such a question of Davis, and he responded in the affirmative.

## II.

This court has explained that

[i]n a Title VII action that has been fully tried on the merits, such that the district court has before it all the necessary evidence to make the ultimate finding of discrimination, the factual inquiry is whether the defendant intentionally discriminated against the plaintiff. On review, this court must therefore decide whether the ultimate finding of discrimination by the district court was clearly erroneous. A finding is clearly erroneous when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.

*Davis v. Yazoo Co. Welfare Dep't*, 942 F.2d 884, 886 (5th Cir. 1991) (internal citations and quotation marks omitted). We review a verdict under the "reasonable juror" standard. The standard is that

[t]he court should consider all of the evidenceSSnot just that evidence which supports the nonmover's caseSSbut in a light and with all reasonable inferences most favorable to the party opposed to the motion [to overturn the jury verdict]. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that *reasonable men could not arrive at a contrary verdict*, granting of a motion is proper.

*Merwine v. Board of Trustees*, 754 F.2d 631, 636-37 (5th Cir. 1985) (emphasis added).

A court should grant a FED. R. CIV. P. 50(a) motion not only when the non-movant presents no evidence, but also when there is not a *sufficient conflict in substantial evidence* to create a jury question.[1] Importantly, this articulation of the standard of review does *not* require a showing of *substantial evidence* in support of the jury verdict (in the manner that this court looks for substantial evidence in support of certain decisions by administrative agencies). Rather, the standard requires merely a finding of a *sufficient* conflict in substantial (meant as a synonym for

---

[1] *Travis v. Board of Regents*, 122 F.3d 259, 263 (5th Cir. 1997) (citation and quotation marks deleted; emphasis added).

"material") evidence. This can be restated as requiring "sufficient material evidence to support the jury's verdict"SSthe reasonable-juror standard.

Evidentiary rulings are reviewed for abuse of discretion. *See Jon-T Chems., Inc.*, 704 F.2d 1412, 1417 (5th Cir. 1983). The district court's interpretation of title VII's limits on liability is reviewed *de novo*. *See United States v. Santos-Riviera*, 183 F.3d 367, 369 (5th Cir.), *cert. denied*, 120 S. Ct. 597 (1999).

### III.

In reviewing a finding of sex discrimination in a case tried to a jury, we examine the record to determine whether sufficient material evidence supports a charge that the plaintiff was treated unfavorably on the basis of sex and that the employer's stated reasons are pretextual. *See Rutherford v. Harris County*, 197 F.3d 173, 181 (5th Cir. 1999). Vance introduced sufficient evidence to support the verdict.

During the search process, Davis approached Ed Neelly, a retired branch president, and asked whether he wanted the job of Oxford branch president. Neelly declined the position and recommended Vance for the position. After Neelly turned down the job, Davis told Neelly that he needed a "mature man in the office in Oxford." Neelly testified that at the time he assumed that Davis meant that he was interested in hiring a "mature man" for the number two position at the new bank. Neelly then testified that in retrospect this assumption was incorrect, i.e., that Davis appears to have wanted a "mature man" to head the branch.

The jury reasonably could have inferred that this preference for "a mature man" at the bank colored his decision to hire Carroll over Vance, especially in light of his subsequent actionsSShiring Carroll as President and offering Vance the number-two position. Vance also testified that Davis told her he wanted to hire a 40- to 50-year-old man for the number two position because such a person would lend stability and credibility to the bank.

Union Planters argues that these comments were "merely stray" and thus insufficient to constitute a basis for liability. We have held, however, that workplace remarks like Davis's may constitute sufficient evidence of discrimination if the remarks are (1) related to sex; (2) proximate in time to the employment action; (3) made by an individual with authority over the employment decision; and (4) related to the employment decision at issue. *See Krystek v. University of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999).

Davis's remark that he wanted to hire a "mature man" is certainly related to sex, was said during the process of considering candidates for the job, was uttered by the individual who made the hiring decision, and was obviously related to Vance's job prospects at the Oxford branch. Therefore, the comment qualifies as direct and material evidence of sex discrimination.[2] Even if Vance were the only witness to testify about the statements at issue,

---

[2] *Cf. Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (holding that a company president's instruction to human resources officials that he did not want to hire older workers constitutes sufficient material evidence of age discrimination); *Portis v. First Nat'l Bank*, 34 F.3d 325, (5th Cir. 1994) (holding that a supervisor's statement to a female subordinate that she "wouldn't be worth as much as the men would be to the bank" constituted direct evidence of sex discrimination).

though she is not, that would not warrant taking the case out of the jury's hands.[3]

On the witness stand, Davis was asked why he pursued a series of male candidates after it appeared that Vance was the only viable candidate for the branch presidency. He responded, "I wanted to get the best guy, the best person, and I saying [sic] that generically." Vance argues that this "Freudian slip" on the stand evinced Davis's desire to hire a male. Union Planters argues that Davis's remark was merely a slip of the tongue.[4]

The comment is susceptible to either construction. In title VII trials, though, the employer is rarely going to concede unambiguously that it intended to violate the law.[5] Because we lack the jury's opportunity to observe Davis's demeanor and hear his voice, and because the statement corroborated Davis's comments that he wanted to hire a "mature man," or a 40- to 50-year-old man, there was sufficient material direct evidence of discrimination to allow a reasonable jury to decide in Vance's favor.

This direct evidence is supported by material circumstantial evidence.[6] For example, Davis never spoke with Pete Boone, Carroll's former boss at Grenada Sunburst Bank, about Carroll's qualifications. Boone testified that had Davis contacted him, he would have told him that Carroll should not even be considered for the job. Davis testified that he called Boone but that his calls went unreturned. Boone's testimony contradicted this.

The jury was entitled to believe Boone's account and conclude that Davis was less than diligent in seeking information about Carroll's qualifications. Davis's testimony concerning the recommendation he sought from Brown,

---

[3] *See id.* at 329 n.10 (holding that "[t]he fact that Portis' case-in-chief consists solely of her own testimony does not prevent her from establishing intentional discrimination").

[4] Union Planters appears to advocate an extension of the "stray remark" caselaw to cover witnesses' statements at trial. It presented no instance in which a court has ever applied its "stray remark" jurisprudence to a witness's trial testimony. Indeed, there are at least three reasons why it would be unwise to do so in this manner. First, the "stray remark" jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of the evidence presented and so should be narrowly cabined. Second, one of the questions at issue in the *Krystek* testSSwhether the remark is proximate in time to the employment decisionSS would always be answered in the negative with respect to testimony at trial, even though words from the dock seem particularly probative of actual state of mine.
Third, in-court testimony, unlike a stray remark made in the workplace, allows the jury to evaluate the context of the remark based on its observations of the witness's demeanor. We decline, therefore, to extend the doctrine in this manner.

[5] *Cf. Aikens*, 460 U.S. at 716 (noting that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes").

[6] Citing *Haas v. Advo Systems, Inc.*, 168 F.3d 732, 734 n.2 (5th Cir. 1999), Union Planters seems to think that to prevail, Vance must provide direct evidence of discrimination. This would be untrue even if Vance had not provided such direct evidence. *See, e.g. Scott v. University of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998) (holding that "[b]ecause direct evidence is rare in discrimination cases, a plaintiff must ordinarily use circumstantial evidence to satisfy her burden of persuasion").

Vance's immediate supervisor, supports this claim.

Brown knew both Vance and Carroll quite well. Nevertheless, after Davis received Brown's "glowing" recommendation in support of Vance's receiving the job, Davis did not bother to discuss Carroll's qualifications with Brown until *after* Carroll was hired. At that time, Brown told Davis that Carroll was "lazy," "not challenged," and that Davis would have to "light a fire under Carroll's ass" to ensure that he would perform his job.

Carroll's personnel file also indicated that he had a tendency to procrastinate and miss deadlines, but Davis never asked to see that file. The jury was entitled to infer from Davis's lackadaisical investigation of Carroll's qualifications and premature hiring of Carroll that he was predisposed to select a man.

There also was uncontradicted evidence that Davis offered the presidency to Ed Neelly and Butch Collums, two men who never applied for the position. The parties dispute whether Davis also offered the job to Hardy Farris. The jury could reasonably infer from these actions that Davis was predisposed to hire a man and began grasping at straws when it appeared that Vance was the only viable applicant. In sum, sufficient evidence supports the finding that Union Planters discriminated against Vance on the basis of sex.

Sufficient evidence also supports the jury's decision that pretext motivated Union Planters's justifications for hiring Carroll over Vance. Union Planters argues that administrative concerns were determinative in the decision. To prevail, Union Planters must provide direct or circumstantial evidence to rebut that explanation for its employment decision. *See Rutherford*, 197 F.3d at 184.

The jury heard credible evidence that Vance's administrative skills were at least as strong as Carroll's. The uncontradicted evidence was that the branch Vance had helped start and later led had experienced dramatic increases in both size and profits. Vance testified that she dedicated thirty percent of her work time to administrative matters. The jury could infer from the branch's success that Vance's administrative skills were excellent.

On the other hand, Carroll was available to fill the branch presidency because he had been demoted from his administrative position at the Sunburst bank. The jury could infer from this that Carroll's administrative skills did not motivate Davis to hire him.

Davis admitted that he thought Vance worked longer hours than did Carroll. The jury could infer that someone who would put more time into the complex task of merging two bank branches would be a better administrator. Some evidence *did* suggest that Carroll's administrative skills were superior to Vance's, but the evidence did not, by its strength, disallow supported inferences in Vance's favor.

IV.

Union Planters claims this case is "controlled" by *Scott*, in which a would-be professor of legal writing sued after failing to be named to the post, claiming age discrimination. She propounded but failed to establish the argument that she was plainly better qualified than the selected individual, who was younger than the age-protected class of which she was a part; beyond this argument, she had no evidence, direct or circumstantial, of age

**6**

discrimination. *Id.* at 497-98. In overturning the verdict in favor of Scott, we held that "an employee's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Id.* at 507 (citations omitted).

Similarly, in *Travis*, we overturned a verdict because the only evidence that a hiring decision was motivated by sex bias was a comment, made seven years prior to the relevant promotion decision by a supervisor who had in the intervening years retired and thus played no role in the complained of failure to promote, that the plaintiff was not "tough enough" to fill a certain position. *See Travis*, 122 F.3d at 264. As the court noted, this comment was a "stray remark" in that it was made by a supervisor other than the one who made the relevant employment decision; it was made remotely from the time of that decision; and it did not obviously call into question the issue of sex. *Id. See also Krystek*, 164 F.3d at 254, 256 (same).

These cases do not control. Vance provided both direct, non-stray-comment evidence that she had been discriminated against because of her sex and circumstantial evidence that indicated that she was the only woman president involved in the consolidation and the only president not provided a place in the new organization, though a place existed for her. This evidence does not, but need not, establish that Vance was "clearly better qualified." Rather, her circumstantial evidence, with the direct evidence (including a comment by the relevant supervisor) that her supervisor wanted to hire males provides sufficient evidence that she was discriminated against because of sex.

Union Planters also argues that the jury erred in awarding Vance damages for emotional distress. Union Planters attempts to undermine

Vance's expert medical testimony by asserting that because neither Neelly nor Carroll suffered psychological trauma when they lost their jobs, no reasonable fact finder could have concluded that Vance suffered such an injury. As Union Planters so colorfully notes, "[b]ankers lending the money of others should be more resilient." We have discovered, however, no caselaw supporting a "banker's exception" to the rule that plaintiffs who suffer emotional distress can recover damages.

V.

Union Planters contends that the district court erred in admitting evidence that Union Planters suffered an adverse verdict against it in a 1990 pay discrimination case. We note initially that we evaluate the jury's findings without regard to this testimony and conclude that, even in exclusion of this exchange, the evidence supports the verdict.

The relevant evidence is as follows:

Q. And in the past, you haveSSyou have been found to discriminate against women, women loan officers in their pay as against male officers; haven't you, sir?

A. Yes, sir.

Q. All right, sir.

A. 1990, I think it was. I cannot recall the exact date.

Union Planters raises two issues with respect to this colloquy. The first, that the admission of this evidence constitutes a bill of attainder, is frivolous. A bill of attainder is, as the name implies, a legislative action rather than a judicial one. *See SBC Communications, Inc.*

*v. FCC*, 154 F.3d 226, 233 (5th Cir. 1998), *cert. denied*, 525 U.S. 1113, *and cert. denied*, 525 U.S. 1113 (1999).

Union Planters's second argumentSSthat admission of the evidence violates FED. R. EVID. 404(b)[7]SSis more substantive. Vance introduced the evidence to show how Union Planters treated the class of women employees. In the context of a title VII suit alleging racial discrimination, evidence concerning an employer's "general policy and practice with respect to minority employment" "may be relevant to any showing of pretext." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973). Similarly, evidence that Union Planters had been found to have discriminated against women in the past could help undermine its argument that it chose not to hire Vance only because of administrative concerns.[8]

---

[7] That rule reads in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[8] *See also McCorstin v. United States Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980) (holding that evidence of a pattern of terminating older workers allowed a reasonable inference that plaintiff had been discharged on account of age); *Dosier v. Miami Valley Broad. Corp.*, 656 F.2d 1295, 1300 (9th Cir. 1981) ("Dosier claims that the post-settlement incidents were part of a continuing pattern of discrimination. . . . [H]e is not prevented from using those incidents as evidence of a continuing pattern of discrimination by Miami
(continued...)

In *EEOC v. General Dynamics Corp.*, 99 F.2d 113, 119 (5th Cir. 1993), we affirmed the admission of "arguably not relevant" evidence that the plaintiff had filed prior discrimination lawsuits against his employers. Despite the danger that such evidence could cause a jury to believe that the plaintiff was unreasonably litigious, we held that such evidence was appropriate, because the plaintiff had testified that he had prevailed in a previous discrimination lawsuit.

Union Planters called Yolaine Couser, a female bank officer, who testified that she had not been discriminated against and that she had never observed discrimination against women in her time at the bank. Davis also testified that he had hired a female to serve as Union Planters's anti-discrimination compliance officer. Because Vance is the party who first raised the pattern-of-discrimination issue, *General Dynamics* is merely instructive, not controlling. When a party has an opportunity to explore admitted evidence of prior acts "through examination of its own witnesses" and exercises that opportunity, the admission of potentially damaging evidence is not reversible error. *See Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1365 (10th Cir. 1987).

Relatedly, Union Planters makes no showing that the admission prejudiced it. It presented testimony from a female officer stating that in the years she worked for the bank, she had never seen discrimination against women. The jury might well have assigned more weight to this evidence about

---

(...continued)
Valley. Evidence of prior acts may clearly be used to establish the existence of a pattern or scheme. See Rule 404(b), Federal Rules of Evidence.").

the firm's current practices than to Davis's brief admission that his firm had discriminated on one occasion in 1990. For these reasons, we see no abuse of discretion in the decision to admit the evidence in question.

## VI.

Title VII limits damage awards based on the number of employees the employer had during the "current or preceding calendar year." 42 U.S.C. § 1981a(b)(3). If, as the district court held, Union Planters had more than 500 employees, its potential liability is $300,000. If, as Union Planters argues, it employed only approximately 140 people, its liability is only $100,000. These limitations on damages look to the number employed "in each of 20 or more calendar weeks in the current or preceding calendar year." *Id.*

## A.

We must decide the meaning of "current or preceding calendar year." The district court held that it refers to the year of judgment; it is undisputed that at the time of judgment, Union Planters had more than 500 employees.

Union Planters correctly contends that "current year" refers to the year in which the discriminatory acts took place. We have interpreted "current year" to refer to the year in which the alleged discrimination occurred. *See Dumas v. Town of Mount Vernon*, 612 F.2d 974, 979 n.4 (5th Cir. 1980).

The district court emphasized that the "current year" language interpreted in *Dumas* was from a different part of title VII, and stated that no court has interpreted the "current year" language of § 1981a(b)(3). The latter assertion is incorrect. In *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1348, 1354 (7th

Cir. 1995), the court limited the damages assessed against a defendant based on the number of employees working for it at the time of the discriminatory firing. The district court's interpretation of "current year" was rejected also in *Komorowski v. Townline Mini-Mart & Restaurant*, 162 F.3d 962, 965 (7th Cir. 1998). There is no reason to define "current year" to mean one thing in one part of title VII and something else in another.[9]

Sound policy analysis supports this reading of the statute. The best reason to use the "year of occurrence" is that any other interpretation allows parties to engage in gamesmanship by structuring companies, or timing the progress of lawsuits, to maximize gain or to minimize loss.

An additional reason is that we presume that part of the reason for the liability cap for smaller corporations is that such entities cannot afford to hire the specially trained human-resource personnel required to negotiate the shoals of modern employment law. These businesses are therefore provided some additional level of protection. Larger companies, better equipped to hire the relative expertise, are held to a more rigorous standard. This purpose would be defeated if the size of the company were measured at the date of verdict rather than the date of commission of the suspect act.

---

[9] *See Department of Revenue of Ore. v. ACF Indus.*, 510 U.S. 332, 342 (1994) (noting the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (internal quotation marks omitted).

## B.

The district court held that even if 1995 were the "current year," Union Planters would have had more than 500 employees:

> Furthermore, even if the court were to use the time of the discriminatory act as the current year for the purposes of the statutory cap, the court would still find that the defendant had more than 500 employees. Union Planters Bank of Northeast Mississippi, which the defendant asserts had no more than 140 employees, did not even exist as of the date of the discriminatory act. The decision-maker, Pat Davis, was the president of First National Bank. The entity to be formed, Union Planters Bank of Northeast Mississippi, consisted of banks belonging to three different subsidiaries of Union Planters Corporation (specifically First National Bank, Sunburst Bank, and United Southern Bank). There was no single subsidiary which could realistically be considered the employer for purposes of the statutory cap. The allegedly discriminatory act was done on behalf of a large corporation by an agent of a large corporation, with well over 500 employees. Accordingly, regardless of how the term "current or preceding year" is applied, the statutory limit on damages should be set at $300,000.00.

In 1995, Pat Davis ran First National Bank and was charged with merging banks belonging to subsidiaries of First National Bank, Sunburst Bank, and United Southern Bank. The product of that merger, Union Planters Bank of Northeast Mississippi, did not exist at the time of the employment action but did come into existence a few months thereafter, in July 1995. The period from then to December 31, 1995, is more than twenty weeks, so even though Union Planters Bank of Northeast Mississippi did not exist at the time of the discriminatory act, it could qualify as Vance's would-be employer under title VII. If it were the relevant employer, then the applicable cap on damages would be $100,000.

By denying Vance's post-verdict motion for discovery regarding Union Planters's size, the district court failed to develop the record with regard to several important facts. First, the court's analysis, which held Union Planters Corporation (the holding company that owned Union Planters Bank of Northeast Mississippi) to be the relevant employer, seems inconsistent with the order dismissing Union Planters Corporation as a defendant. Second, the court failed to engage in the searching inquiry called for by *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983), which is this circuit's leading precedent on the size of an employer for title VII liability purposes.

Under *Trevino*, the court must determine whether nominally independent entities⸺First National Bank, Sunburst Bank, and United Southern Bank⸺are a single employer for purposes of title VII liability. If so, their total employment should be aggregated.

Third, the record does not reveal who would have been Vance's employer before July 1995, had she been offered the job. Looking to who employed Carroll between March 15, 1995, and July 1, 1995, might answer this question. The trier of fact would need to determine how many employees that firm employed in 1995 and 1994.

Any of these factors could affect the limitation on damages. Because the record is insufficiently developed for us to engage in that analysis, we remand for such a determination.

We therefore AFFIRM the judgment except with regard to the interpretation of § 1981a-(b)(3), VACATE that portion of the judgment, and REMAND for further proceedings.