**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PAMELA L. DEPAOLI,
                    *Plaintiff-Appellee,*

v.

VACATION SALES ASSOCIATES, L.L.C.,
                    *Defendant-Appellant,*

and

BREEDEN COMPANY; BREEDEN
DEVELOPMENT; VACATION SALES,
INCORPORATED; ATRIUM CORPORATION,
                    *Defendants.*

No. 06-1282

PAMELA L. DEPAOLI,
                    *Plaintiff-Appellee,*

v.

VACATION SALES ASSOCIATES, L.L.C.,
                    *Defendant-Appellant,*

and

BREEDEN COMPANY; BREEDEN
DEVELOPMENT; VACATION SALES,
INCORPORATED; ATRIUM CORPORATION,
                    *Defendants.*

No. 06-2268

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:04-cv-00635-RAJ)

Argued: March 15, 2007

Decided: June 12, 2007

Before NIEMEYER and DUNCAN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed as modified by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Duncan and Senior Judge Hamilton
joined.

---

**COUNSEL**

**ARGUED:** Robert Martin Tata, HUNTON & WILLIAMS, Norfolk,
Virginia, for Appellant. John Michael Loeschen, Roanoke, Virginia,
for Appellee. **ON BRIEF:** Wendy C. McGraw, HUNTON & WIL-
LIAMS, Norfolk, Virginia, for Appellant.

---

**OPINION**

NIEMEYER, Circuit Judge:

Pamela Depaoli commenced this action against her former
employer, Vacation Sales Associates, L.L.C., under Title VII of the
Civil Rights Act of 1964, alleging that she was discharged from her
position as a sales manager in retaliation for filing a complaint of
employment discrimination with the Equal Employment Opportunity
Commission, in violation of 42 U.S.C. § 2000e-3(a). A jury returned
a verdict in favor of Depaoli, awarding her $7.7 million for compen-
satory damages, backpay, and punitive damages. The district court,
applying the statutory cap on damages, awarded Depaoli compensa-
tory and punitive damages of $200,000; acting in equity, recalculated
backpay and awarded Depaoli backpay of $208,708; and awarded her
attorneys fees and costs of $239,865.38.

On appeal, we modify the awards of backpay and attorneys fees
and, as so modified, affirm the judgment of the district court.

I

Vacation Sales Associates, L.L.C., a developer, marketer, and seller of timeshare properties in Virginia Beach, Virginia, employed Pamela Depaoli as a sales associate in April 1997. By 2001, Depaoli had become a sales manager for the in-house sales department, focusing on people who already owned timeshare units.

In the fall of 2001, the position of director of in-house sales came open, and Depaoli made an inquiry about obtaining that position. Vacation Sales President Tim Faulkner told her, however, that the position was to be eliminated. Nonetheless, a few weeks later, he hired David Hamlin for the position.

Depaoli alleged that Hamlin, who had become her superior, verbally harassed her and the sales associates under her supervision regarding their sex and age. She complained to Faulkner in February 2002 but was dissatisfied with how he handled her concerns. In March 2002, Depaoli contacted the Equal Employment Opportunity Commission ("EEOC") to ascertain her rights. Although she did not file a complaint at that time, she told several employees, including Vacation Sales Vice President George Georgitsis, that she had contacted the EEOC. Shortly thereafter, Faulkner transferred Depaoli, along with her team of sales associates, away from Hamlin.

In July 2002, Hamlin's employment was terminated and the director of in-house sales position again became vacant. Despite Depaoli's expressed interest in the position, the responsibilities of the position were transferred to a male, Mark Rosenfield.

In March 2003, after another position that Depaoli desired was vacated and filled by a male, Depaoli contacted the EEOC a second time to initiate an investigation. Depaoli again told coworkers, including Vice President Georgitsis of her action.

Until that point in time, Depaoli had performed well as a sales manager, producing strong "Average Per Guest" figures.[1] Indeed, for

---

[1]Both sales associates and sales managers at Vacation Sales were compensated through commissions, receiving a percentage of revenues from

the period spanning January to March 2003, Depaoli's Average Per Guest surpassed that of the two other comparable sales managers by nearly 25%.

In April 2003, however, after Depaoli had contacted the EEOC to conduct an investigation, Depaoli's Average Per Guest dropped sharply, and she became the sales manager with the lowest Average. She began to suspect that Vacation Sales' management were taking steps to dampen her sales figures. In May 2003, with her sales figures remaining subpar, Depaoli filed a formal complaint with the EEOC, alleging sex discrimination in violation of Title VII. That month she became anxious and ill and took a three-week leave of absence.

When Depaoli returned to work at the end of June 2003, she discovered that yet another position she would have sought had become available and filled during her absence by a male. Depaoli and her sales team had continued to perform poorly in June 2003, and Georgitsis directed her to terminate three of her sales associates. By mid-July 2003, Depaoli's Average Per Guest was about 15% lower than the next highest sales manager's. Finally on July 17, 2003, Depaoli was offered a lesser paying position as an in-house sales associate. When she declined the position, her employment as sales manager was terminated.

Depaoli commenced this action in October 2004, claiming that Vacation Sales removed her from her sales manager position in retaliation for filing a claim with the EEOC, in violation of 42 U.S.C. § 2000e-3(a). A jury agreed and awarded Depaoli backpay of $200,000, compensatory damages of $2.5 million, and punitive damages of $5 million.

Vacation Sales filed post-trial motions for application of the statutory cap on damages provided by 42 U.S.C. § 1981a(b)(3), for judg-

---

sales they had helped complete. The key factor that determined a sales associate's or sales manager's compensation was her ratio of sales to tours of properties, known as her "Average Per Guest." In the case of a sales associate, the Average Per Guest was calculated by dividing the sales associate's total sales figure by the number of tours she conducted. In the case of a sales manager, the Average Per Guest was the total sales figure divided by the number of sales she attempted to close.

ment as a matter of law, and in the alternative, for a new trial. The district court reduced the compensatory and punitive damage award to $200,000 in accordance with the statutory cap and, as a court of equity, recalculated the award of backpay, awarding $208,708. The court also awarded Depaoli attorneys fees in the amount of $235,260, plus costs of $4,605.38. This appeal followed.

## II

Vacation Sales contends first that the evidence was insufficient to support the jury's verdict and that the district court erred in denying its motion for judgment as a matter of law on liability.

There is no suggestion that Depaoli failed to prove a prima facie case of retaliation — she stated that she was removed from her sales manager position in retaliation for her May 2003 EEOC filing. Likewise, there is no contention that Vacation Sales failed to meet its burden of giving a reason for firing Depaoli — that her sales were substandard. Vacation Sales centers its argument on the contention that the evidence was insufficient for a reasonable jury to conclude that Vacation Sales' proffered reason for terminating Depaoli was merely a pretext for the alleged retaliation. We have little doubt, however, in concluding that the jury heard sufficient evidence to support its finding that the reason given for firing Depaoli was a pretext.

First, Cynthia McLachlin, a former Vacation Sales sales associate, testified that in March 2002, soon after Depaoli made her initial contact with the EEOC, McLachlin overheard a speaker-phone conversation between President Faulkner and Vice President Georgitsis. She testified that Faulkner said to Georgitsis, "I'm not going to have any lawsuits on my watch." After Faulkner hung up, Georgitsis shared with McLachlin a letter to Depaoli that required her to meet for supervision. McLachlin told Georgitsis that the required meeting would humiliate Depaoli who would rather quit than submit to the letter's terms, and Georgitsis responded, "That's what we are hoping she does for going to the EEOC; [Faulkner] doesn't want her here any longer."

Second, Sandra Williams, a former Vacation Sales manager, testified that sometime after Depaoli was removed, Williams told Georgitsis that she contemplated filing a complaint with the EEOC because

of another co-worker's actions. Georgitsis replied to Williams, "You don't want to do that. . . . You will end up like Pam Depaoli."

Third, Depaoli testified that in June 2003, upon returning from a leave of absence to discover that a position she desired had been filled, Georgitsis told her that "if [she] didn't start an investigation with the EEOC, [she] would have gotten that in-house director position."

In addition to this direct evidence of Vacation Sales' motives for removing Depaoli, the jury also heard evidence of actions Vacation Sales employees took to dampen Depaoli's Average Per Guest figures after Depaoli had contacted the EEOC in March 2003. For example, Victoria Headden, a former Vacation Sales receptionist responsible for assigning tours to sales associates, testified that in March 2003, sales managers began "cherry picking" likely purchasers out of group tours, even though those tours (and purchasers) were supposed to be handled by a different manager. Headden testified that Georgitsis told her to permit only certain managers to engage in "cherry picking," and Depaoli was not one of them. Also, Headden testified that in April 2003, Georgitsis directed her to assign unsuccessful group tours to particular sales associates, and to assign a higher proportion of those unsuccessful tours to members of Depaoli's team.[2]

Finally, the sharp drop in Depaoli's Average Per Guest — falling from 1,228 in March 2003 to 467 in April 2003, the month after she filed her complaint with the EEOC — provided circumstantial evidence that the conduct of Vacation Sales' management did effect a drop in Depaoli's sales figures.

Vacation Sales argues that judgment as a matter of law should have been entered in its favor because the evidence could not support a finding that actions taken by Vacation Sales employees were the *actual cause* of the drop in Depaoli's Average Per Guest. This argu-

---

[2]While this does not necessarily mean that unsuccessful tours were assigned to Depaoli personally, this tactic would cause the team which Depaoli was responsible for to appear less productive. Further, it shows that Georgitsis singled out Depaoli for worse treatment than other sales managers.

ment, however, misses the point of the evidence — to show that Vacation Sales tried to sabotage Depaoli, not that they succeeded, thus supporting the claim that the true reason Vacation Sales removed Depaoli was retaliation for her contacting the EEOC. Even if Vacation Sales' management only *attempted* to manipulate Depaoli's Average Per Guest, the evidence was probative. Such evidence, when combined with the explicit statements made by Vacation Sales' management regarding their displeasure with Depaoli's contacting the EEOC, provided ample support for the jury's finding that Vacation Sales retaliated against Depaoli, in violation of Title VII. Accordingly, we affirm the district court's denial of Vacation Sales' motion for judgment as a matter of law.

## III

Vacation Sales next argues that the district court should have granted its motion for a new trial with regard to compensatory and punitive damages, contending that the jury's award was excessive. In making this argument, Vacation Sales focuses on the amounts awarded by the jury — $2.5 million in compensatory damages and $5 million in punitive damages. The actual amount of damages that the district court awarded, however, was $200,000, the maximum permitted by the applicable statutory cap. *See* 42 U.S.C. § 1981a(b)(3)(C). Because this capped amount, not the jury's verdict, became the judgment against Vacation Sales, we review the capped amount on appeal. *See Peyton v. DiMario*, 287 F.3d 1121, 1126-28 (D.C. Cir. 2002) (reviewing the district court's award of $300,000, reduced per statutory cap from a jury award of $482,000); *Luciano v. Olsten Corp.*, 110 F.3d 210, 220-22 (2d Cir. 1997) (reviewing "the district court's decision to uphold the jury's award of [over $5 million in] punitive damages, as modified by the statutory limitation" of § 1981a(b)).

Given the evidence that Depaoli offered about her emotional distress and the conduct supporting retaliation, we cannot say that the district court abused its discretion in refusing to remit the aggregate award of $200,000 for compensatory and punitive damages. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) ("The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court"). Accordingly, we affirm the district court's denial of a motion for a new trial on damages.

IV

Vacation Sales next requests that the district court's award of back-pay be vacated or reduced, advancing numerous reasons, mostly challenging the district court's discretion and findings about calculations and mitigation. We have carefully reviewed each of Vacation Sales' claims and affirm on all but one.

The district court undervalued the amount that Depaoli earned in mitigation through other employment during the backpay period. The record shows that Depaoli made $18,000 as a mortgage lender and $58,000 at Gold Key Resort, for a total of $76,000. The district court, however, used a figure of $47,000 for the income from Gold Key Resort, which was based on Depaoli's earlier but erroneous testimony. Depaoli later corrected the error, testifying that she had actually earned $58,000, and the parties agree that $58,000 is the correct figure.

Accordingly, applying the $58,000 figure, in lieu of the $47,000, for mitigation, Depaoli's backpay award, excluding interest, must be reduced from $197,500 to $186,500. The interest awarded by the district court on that sum must also be reduced proportionately, from $11,208 to $10,584. Accordingly, we modify the district court's award of backpay from $208,708 to a total of $197,084, and, with that modification, affirm the district court's award of backpay.

V

Vacation Sales also seeks a new trial based on numerous evidentiary rulings. We have reviewed these rulings carefully and have concluded that the district court did not abuse its discretion. Moreover, any error would not have affected Vacation Sales' substantial rights so as to justify a new trial. *See* Fed. R. Evid. 103(a); Fed. R. Civ. P. 61.

VI

Vacation Sales contends that the district court misconstrued the statutory cap of compensatory and punitive damages provided by 42

U.S.C. § 1981a(b)(3), by applying the criteria for imposing the cap based on when the *violation occurred* rather than when the compensatory and punitive *damages awards were made*. If the criteria are applied as to the time the damages awards were made, the cap would lower compensatory and punitive damages to the aggregate sum of $100,000.

The relevant portion of § 1981a(b)(3) provides:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party —
>
> (A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks *in the current or preceding calendar year*, $50,000;
>
> (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks *in the current or preceding calendar year*, $100,000; and
>
> (C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks *in the current or preceding calendar year*, $200,000
> . . . .

42 U.S.C. § 1981a(b)(3) (emphasis added).

The district court read the phrase "in the current or preceding calendar year" as referring to the year in which Vacation Sales committed the Title VII violation. Because Vacation Sales had more than 200 and fewer than 501 employees in 2002, the year preceding Depaoli's discharge, the district court capped her damages at $200,000. *See* 42 U.S.C. § 1981a(b)(3)(C). Vacation Sales would read the operative language as referring to the year in which the damages were awarded

— 2006. Because it employed more than 100 and less than 201 employees in 2005 and 2006, Vacation Sales contends that damages should be capped at $100,000. *See id.* § 1981a(b)(3)(B). Of course, under Vacation Sales' interpretation, if it had 200 employees at the time it committed a violation of Title VII but reduced its personnel to under 15 by the time of the award, no cap would be applicable.

The possibility of uncapped damages, as would result from Vacation Sales' interpretation, along with the maxim that "identical words used in different parts of the same act are intended to have the same meaning" requires that § 1981a(b)(3) be interpreted in light of Title VII's other provisions containing the same language. Specifically, 42 U.S.C. § 2000e(b) defines "employer" as "a person . . . who has 15 or more employees for each working day in each of 20 or more calendar weeks *in the current or preceding calendar year* . . . ." Reading §§ 1981a(b)(3) and 2000e(b) together, it becomes apparent that the reason § 1981(b)(3) provides no damage cap for employers with less than 15 employees is that such employers are presumed to be exempt from Title VII's requirements by virtue of § 2000e(b). The interdependence of these provisions requires that they be construed to operate with reference to the same year. Moreover, § 2000e(b) unquestionably references the year of the alleged violation. Otherwise, an employer with just a handful of employees could be held accountable in the future, after it grew in size, for actions that it took while it still had less than 15 employees. Because § 2000e(b) must be interpreted in reference to the year of the Title VII violation, § 1981a(b)(3)'s damage cap must also be so interpreted. *See Vance v. Union Planters Corp.*, 209 F.3d 438, 446 (5th Cir. 2000); *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). Therefore, we hold that § 1981a(b)(3)'s language "current or preceding year" refers to the year of the Title VII violation, and we affirm the application of the $200,000 cap imposed by the district court for compensatory and punitive damages.

VII

Finally, Vacation Sales contends that the district court abused its discretion in awarding attorneys fees and costs to Depaoli, pursuant to 42 U.S.C. § 2000e-5(k).

Vacation Sales objected to Depaoli's initial motion for attorneys fees and costs because the time records of Depaoli's attorney, John Loeschen, contained duplicative, vague, and unreasonable entries. In reply, Loeschen produced amended time records in which he added more detail and purported to have corrected errors. Loeschen also abandoned his originally claimed hourly rate of $225 per hour and sought a higher "market rate" of $305 per hour for 2004 and $325 for 2005 and 2006, based on what Vacation Sales' attorneys were charging Vacation Sales. The district court accepted the higher rate and awarded Depaoli $235,260 in fees and $4,605.38 in costs.

In claiming attorneys fees, Depaoli had the burden of "produc[ing] specific evidence of the 'prevailing market rates in the relevant community' for the type of work" Loeschen performed. *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The market rate should be determined by evidence of "what attorneys earn from paying clients for similar services in similar circumstances," which, of course, may include evidence of what the plaintiff's attorney actually charged his client. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).

Because there is an absence of evidence in the record to support a market rate of $305 and $325 per hour for charges by a plaintiff's Title VII attorney in Title VII cases, we are left only with the relevant evidence that Loeschen himself regularly charged Depaoli $225 per hour. Thus, applying the $225 hourly rate to the 726.4 hours for which the district court awarded attorneys fees, we reduce the award from $235,260 to $163,440. On all other issues relating to attorneys fees and costs, we affirm.

VIII

In sum, we affirm the district court's order denying Vacation Sales' motion for judgment as a matter of law and for a new trial; we modify the court's judgment by adjusting Depaoli's award of backpay to $197,084 and award of attorneys fees to $163,440. As modified, we affirm the judgment of the district court. Thus, the judgment in favor of the plaintiff awards her $197,084 in backpay, $200,000 in compen-

satory and punitive damages, $163,440 in attorneys fees, and $4605.38 in costs.

*AFFIRMED AS MODIFIED*