Linda Margaret SALVESON, Plaintiff-Respondent,

v.

DOUGLAS COUNTY and Wisconsin County Mutual Insurance Corporation, Defendants-Appellants-Petitioners.

Supreme Court

*No. 99–0946. Oral argument April 11, 2001.—Decided July 10, 2001.*

2001 WI 100

(Also reported in 630 N.W.2d 182.)

For the defendants-appellants-petitioners there were briefs by *John J. Prentice, Andrew T. Phillips* and *Prentice & Phillips*, Milwaukee, and oral argument by *Andrew T. Phillips* and *John J. Prentice*.

For the plaintiff-respondent there was a brief by *Kyle H. Torvinen* and *Hendricks, Knudson, Gee, Hay-*

*den, Torvinen & Weiby, S.C.*, Superior, and oral argument by *Kyle H. Torvinen*.

¶ 1. DAVID T. PROSSER, J. Linda Salveson was employed by Douglas County from 1981 until 1995. In 1996, she filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to e–17 (1994) (Title VII),[1] alleging that she had been subjected to illegal sexual harassment and gender discrimination virtually the entire time of her service with the County. The perpetrator of the harassment and discrimination was Richard Collyard, Salveson's supervisor at the Douglas County Ambulance Service.

¶ 2. On August 14, 1998, after a weeklong trial, a Douglas County jury awarded Salveson $356,220 in damages. The Douglas County Circuit Court, Michael T. Lucci, Judge, denied the County's post-trial motion to reduce the award to $200,000 pursuant to 42 U.S.C. § 1981a(b)(3), a provision that limits awards of compensatory and punitive damages based upon the number of persons employed by the employer. However, the court reduced the award to $300,000, plus $1,220 for past medical expenses. As to "equitable remedies" that were left to the court to determine separately, Judge Lucci awarded Salveson back pay, front pay, attorney fees, interest, and costs totaling $254,559.07, bringing the total judgment to $555,779.07.

¶ 3. Douglas County appealed, and the court of appeals affirmed. *Salveson v. Douglas County*, 2000 WI App 80, 234 Wis. 2d 413, 610 N.W.2d 184.

---

[1] All subsequent references to the United States Code are to the 1994 version unless otherwise noted.

¶ 4. On review, the following issues are presented:

(1) Did the circuit court err in awarding Linda Salveson back pay, notwithstanding her vocational disability?

(2) Did the circuit court err in awarding Salveson front pay, notwithstanding her vocational disability?

(3) Did the circuit court err in declining to offset the awards of back pay and front pay by the amount of the disability benefits received by Salveson?

(4) Did the circuit court err in determining that Salveson's award of front pay is not subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3), which limits compensatory and punitive damages?

(5) Did the circuit court err in determining that for purposes of the damages cap, the number of persons employed by Douglas County should be measured at the time the discrimination occurred, rather than at the time of the judgment awarding Salveson damages?

¶ 5. We conclude that the circuit court properly exercised its discretion in awarding back pay and front pay, and in declining to offset the awards by the disability benefits Salveson also received. We further conclude that the circuit court correctly determined that front pay does not fall under compensatory or punitive damages and therefore is not subject to the damages cap, and properly measured the number of employees at the time the discrimination occurred. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 6. Linda Salveson began work as a part-time employee with the Douglas County Ambulance Service in 1981. Over the next 14 years, she enhanced her professional credentials, moving from a certified nurse's assistant, to a licensed practical nurse, to an emergency medical technician, to a nationally registered paramedic. In 1986, she was given a full-time position with the County, but only after she challenged a maneuver to deny her the promotion.

¶ 7. During her employment with the County ambulance service, Salveson was subjected to crude sexual harassment and discrimination by her supervisor, Richard Collyard. The long litany of epithets, insults, abuses, actions, and discrimination which she endured eventually led to serious psychological problems affecting Salveson's future employment. The County concedes that Collyard's conduct toward Salveson was "abhorrent." It is less forthcoming about its failure to take remedial action

¶ 8. On December 24, 1993, Salveson injured her knee while at work. The County describes her injury as "wholly unrelated to unlawful discriminatory conduct." Salveson's testimony at trial, undisputed by the County or any witness at trial, tells a different story. On the day before Christmas, Collyard brought his personal tractor to work, intending that work be done on it on County time. The tractor was transported on a single-axle trailer. Collyard insisted that Salveson assist him in attaching a particular part to the tractor. Although she resisted, Salveson did not feel she had any choice but to comply. Salveson was unable to attach the part without climbing onto the tractor, so she asked Collyard to stabilize the trailer, and he assured her he would. After she climbed onto ·the

507

trailer, however, Collyard walked to the back of the trailer, and the trailer tipped. The tractor moved off of the trailer into Salveson's legs, pinning her knee against the trailer. Salveson was suspended in the air and had to be helped down.

¶ 9. As a result of this incident, Salveson suffered a knee injury and later required knee surgery. This permanent knee injury ultimately led to Salveson's referral for duty disability benefits in 1995. Meanwhile, Collyard told others Salveson had injured the knee skiing.

¶ 10. After the knee operation, Salveson was put on light duty, working in an office capacity. Salveson testified at trial that while on light duty, she was in closer contact with Collyard and his harassment intensified. She returned to her paramedic work in December 1994, but hurt her back in a fall in April 1995. She was again put on light duty, consisting primarily of clerical work. She also began to work part-time for a hospital as a licensed practical nurse. When Salveson began working light duty in April 1995, her wages were inexplicably and improperly reduced from $10.21 per hour to $4.25 per hour. Salveson did not receive her full pay until months later. On September 27, 1995, she was transferred to the Douglas County Register of Deeds, where she worked for the remainder of her employment with Douglas County.

¶ 11. Salveson initially filed a complaint with the Douglas County Harassment and Discrimination Committee in November 1994. Harassment investigators found "a systematic pattern of harassment" by Salveson's department head, Collyard. The investigators reported their findings to the County's personnel director, but he did nothing and later testified that

Collyard, a personal friend, was never disciplined for his behavior.

¶ 12. Salveson filed complaints with both the Wisconsin Department of Industry, Labor and Human Relations (DILHR), and the Equal Employment Opportunity Commission (EEOC), alleging unlawful employment discrimination and sexual harassment. On October 31, 1995, DILHR made an initial determination of "probable cause to believe County of Douglas Ambulance Dept. violated the Wisconsin Fair Employment Law. . .by: discriminating against [Salveson] in terms or conditions of employment because of sex." DILHR certified the need for a hearing on the matter.

¶ 13. Salveson left her job as an LPN in August 1995. In November 1995 she was granted a disability pension due to her back and knee injuries, and terminated her employment with Douglas County.

¶ 14. On January 1, 1996, Gold Cross Ambulance took over the operations of the Douglas County Ambulance Service, and Collyard began to work for Gold Cross. His presence with the company made it impossible for Salveson to seek employment with the new operation.

¶ 15. On March 21, 1996, the EEOC granted Salveson permission to sue Douglas County and Collyard for alleged violations of Title VII and of 42 U.S.C. §§ 12102–12213, the Americans with Disabilities Act of 1990 (ADA). Salveson brought a lawsuit against Douglas County and Collyard on June 17, 1996, alleging violations and seeking damages under Title VII as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. She also raised numerous other claims.[2]

---

[2] Salveson also raised claims under the Wisconsin Fair Employment Act, Wis. Stat. §§ 111.31–111.395 (WFEA) (1997–98), and the ADA, as well as numerous common law

¶ 16. Salveson went to trial on her Title VII and ADA claims in 1998.[3] She testified that Collyard and Douglas County had sexually harassed her and discriminated against her because of her gender. Dr. Ken Pride, a psychologist who had treated Salveson, testified that Salveson suffered from anxiety, post-traumatic stress disorder, and depression. He stated that these conditions were caused at least in part by her "hostile" work environment, and opined that she would be unable to work full-time for three years. Collyard did not testify at the trial.

¶ 17. At the end of the trial, the jury rendered a verdict finding that Douglas County, by its employees, had: discriminated against Salveson, subjected her to sexual harassment, retaliated against her, discriminated against her on the basis of her disability, and by doing these things, caused her injury. The jury awarded Salveson $1,220 for past medical expenses, $15,000 for future medical expenses, $40,000 for future loss of earning capacity, $200,000 for past pain and

claims, alleging assault and battery, intentional infliction of emotional distress, negligence, and misrepresentation. In her amended complaint, Salveson added Wisconsin County Mutual Insurance Corporation as a party.

All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[3] On July 6, 1998, the circuit court dismissed all of Salveson's common law claims because she failed to file a notice of claim with Douglas County, as required by Wis. Stat. § 893.80. The court also dismissed Salveson's claim regarding violation of the WFEA, because the claim sought an essentially administrative remedy. Finally, the court dismissed Collyard from the suit, since the parties agreed that he was not properly subject to the Title VII or ADA claims, and all the remaining claims had been dismissed.

suffering, and $100,000 for future pain and suffering, for a total of $356,220.

¶ 18. The County filed post-verdict motions, claiming that the evidence adduced at trial was insufficient to support the awards of damages, and that the total damages awarded should be reduced to $200,000 pursuant to the damages limitation (damages cap) imposed by 42 U.S.C. § 1981a(b)(3), the Civil Rights Act of 1991. Under the damages cap, the sum of compensatory and punitive damages is limited based on the number of persons employed by the employer. Damages are capped at $200,000 for employers with between 200 and 500 employees, and at $300,000 for employers with more than 500 employees. 42 U.S.C § 1981a(b)(3)(C) and (D). The County asserted that the number of employees should be determined at the time damages were awarded, when Douglas County had fewer than 500 employees.

¶ 19. The circuit court upheld the verdict in a memorandum decision issued November 10, 1998.[4] It denied the County's motion to cap the damages at $200,000, finding that the number of employees was properly measured at the time of the discrimination, when Douglas County had more than 500 employees. The court therefore determined that compensatory and punitive damages should be limited to $300,000.[5] The circuit court also awarded $89,434 in back pay from Salveson's last day of work, November 1, 1995, until

_____

[4] The circuit court issued an Amended Memorandum Decision on November 16, 1998, adjusting its calculation of interest on Salveson's award.

[5] The circuit court reduced the jury award from $356,220 to $301,220—$1,220 for past medical expenses, and $300,000 in compensatory and punitive damages, as limited by 42 U.S.C. § 1981a(b)(3).

511

August 14, 1998, the day the verdict was rendered. In addition, it awarded $27,744 in front pay, extending one year from the date of the verdict. The court determined that these awards should not be subject to the cap on damages, but that they should be offset by the disability benefits Salveson received beginning November 1, 1995. The court also awarded attorney fees, interest, and costs totaling $137,374, bringing Salveson's total award to $555,779.07.[6]

¶ 20. Salveson later filed a motion for reconsideration, claiming that that her awards of back pay and front pay should not be reduced by the amount of disability benefits paid to her. After briefing and oral argument, the circuit court granted Salveson's motion.

¶ 21. The County appealed the circuit court's decision, claiming that: (1) insufficient evidence supported the jury's finding that Salveson suffered a loss of earning capacity; (2) the circuit court erred in awarding back pay; (3) the circuit court erred in awarding front pay; (4) the court erroneously set the damages cap at $300,000 instead of $200,000; and (5) the court erroneously allowed Salveson to present new evidence on her motion for reconsideration.

¶ 22. In an opinion authored by Judge Gregory A. Peterson, the court of appeals denied the County's appeal except as to the first claim, on which it found that insufficient evidence supported the jury finding of lost earning capacity. *Salveson*, 234 Wis. 2d 413, ¶¶ 9–10. The court of appeals determined that the cir-

---

[6] The circuit court initially determined that the duty disability benefits received by Salveson should be deducted from her award of back pay and front pay, but did not determine the amount of the duty disability benefits she received.

The amount of disability benefits received by Salveson is not established in the record.

cuit court had properly awarded front pay and back pay and determined that neither was subject to offset. *Id.* at ¶¶ 19, 21, 24, 27 n.12. The court also determined that the award of front pay was not subject to the damages cap, that compensatory and punitive damages were properly limited to $300,000, and that the circuit court had not erred in allowing new evidence on reconsideration. *Id.* at ¶¶ 35–36, 40, 43–44. The court of appeals therefore affirmed the full award of $555,779.07.[7] *Id.* at ¶ 45.

¶ 23. We granted the County's petition for review. The County now argues that the circuit court should not have awarded Salveson back pay or front pay because her inability to work was due to her knee and back injuries, not to harassment and discrimination. It claims that if back pay or front pay is awarded, each must be offset by the amount of the duty disability benefits Salveson received. It asserts that if front pay is awarded, it is subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3). Finally, the County claims that damages should be limited based on the number of employees at the time the award is made, not at the time the harassment or discrimination occurred, so compensatory and punitive damages awarded to Salveson should be limited to $200,000, instead of $300,000.

---

[7] The finding that Salveson was not entitled to damages for lost earning capacity had no effect on Salveson's award. The jury awarded Salveson $356,420, including $40,00 in lost earning capacity. Reducing the award by $40,000 leaves $316,420. Regardless of the $40,000 reduction, Salveson's compensatory and punitive damages were limited to $300,000 by application of 42 U.S.C. § 1981a(b)(3).

## II. ANALYSIS

¶ 24. Title VII of the Civil Rights Act of 1964 serves two purposes. It deters employers from discriminating against employees on the basis of sex, race, color, religion, or national origin, and it serves to make persons whole for injuries suffered because of unlawful employment discrimination.[8] *Franks v. Bowman*, 424 U.S. 747, 763 (1976); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18 (1975). A victim under Title VII is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994). Making a victim of employment discrimination whole may entail the use of both legal and equitable remedies. *Albemarle Paper Co.*, 422 U.S. at 418.

¶ 25. Under the original Civil Rights Act of 1964, equitable relief was the sole available remedy. 42 U.S.C. § 2000e–5. Equitable relief consisted primarily of reinstatement of the employee with or without back pay. *Id.* In 1972, § 706(g) was amended to allow courts to award "any other equitable relief as the court deems

---

[8] While Title VII applied to discrimination based on gender from the inception of Title VII in 1964, sexual harassment was not recognized as a form of sex discrimination until 1976, in *Williams v. Saxbe*, 413 F. Supp. 654 (D.D.C. 1976). Barbara T. Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 3, 13 (1992). In 1980, the EEOC published guidelines interpreting Title VII as applying to sexual harassment. Equal Employment Opportunity Comm'n, *1980 Guidelines on Sexual Harassment*, *reprinted in* Lindemann & Kadue, *supra*, at 655. In 1986, the Supreme Court recognized "hostile environment" sexual harassment as a claim under Title VII, in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986). Lindemann & Kadue, *supra*, at 3,8.

appropriate." 42 U.S.C. § 2000e–5(g)(1).[9] Equitable relief generally consisted of "back pay, reinstatement, and/or front pay." Equal Employment Opportunity Comm'n, *Policy Guide on Compensatory and Punitive Damages Under 1991 Civil Rights Act* § 1 n.5 (1992), *reprinted in* Mary Rose Strubbe et al., *Sexual Harassment in Employment Law* 405 (1999 Supp.). Then, in 1991, Congress amended the Civil Rights Act of 1964 again, allowing courts to award compensatory and punitive damages.[10]

---

[9] Section 706(g) of the Civil Rights Act of 1964 is codified at 42 U.S.C. 2000e–5(g).

[10] The Civil Rights Act of 1991 amended the Civil Rights Act of 1964, providing in relevant part:

(a) Right of recovery
 (1) Civil rights
 In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination. . .the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

 . . . .

(b) Compensatory and punitive damages
 (1) Determination of punitive damages
 A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
 (2) Exclusions from compensatory damages
 Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.

42 U.S.C. § 1981a.

¶ 26. The circuit court in this case awarded Salveson back pay and front pay, which are equitable remedies meant to make her whole for the injuries she suffered due to unlawful employment discrimination. The County contends that the circuit court should have awarded neither back pay nor front pay. We will first address the award of back pay.

A. Back Pay

¶ 27. Back pay is an equitable remedy commonly utilized to compensate the victim of unlawful employment discrimination and to deter employers from discriminating. *Albemarle Paper Co.*, 422 U.S. at 421. The appropriate amount of a back pay award is determined by ascertaining the difference between actual wages earned and what would have been earned if not for the discrimination. *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 786–87 (7th Cir. 1979).

¶ 28. Whether to award back pay in Title VII cases is a discretionary decision for a circuit court. *Franks*, 424 U.S. at 763–64. However, when a plaintiff proves unlawful discrimination under Title VII, "an award of backpay is the rule, not the exception." *Carrero v. N. Y. City Hous. Auth.*, 890 F.2d 569, 580 (2d Cir. 1989). Once a court finds unlawful discrimination, it is to presume that back pay should be awarded. *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000); *Booker III v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995); *see EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992); *see also Albemarle Paper Co.*, 422 U.S. at 421. In such cases, "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of

eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co.*, 422 U.S. at 421. If a circuit court elects *not* to award back pay, it must "carefully articulate its reasons." *Id.* at n.14.

¶ 29.　As we have noted, the decision to award back pay is discretionary for the circuit court. *Franks*, 424 U.S. at 763–64. We therefore will not disturb the decision unless it constitutes an erroneous exercise of discretion. *Meier v. Champ's Sport Bar & Grill, Inc.*, 2001 WI 20, ¶ 42, 241 Wis. 2d 605, 623 N.W.2d 94. A circuit court has not erroneously exercised its discretion if it "considered the relevant facts, properly interpreted and applied the law, and reached a reasonable determination." *Id.*

¶ 30.　In deciding to award back pay, the circuit court found that Salveson was physically unable to work as a full-time street paramedic, but that she was able to perform other, less rigorous paramedic work. The court noted that after she became physically unable to work as a full-time street paramedic, Salveson worked as an LPN, a medical examiner, and a file clerk for the Douglas County register of deeds. The circuit court concluded that the evidence adduced at trial supported a finding that "[Salveson] was qualified to work as a paramedic with Gold Cross either as a paramedic instructor or in some other limited capacity to accommodate her physical limitations, and although she would have been hired if she had applied, she did not [apply] because of the presence of her former supervisor." In referring to the discrimination and harassment, the court further concluded that "had it not been for this conduct, plaintiff would most likely

have been hired by Gold Cross either as an instructor or in some other light capacity."

¶ 31. The County asserts that the circuit court erroneously exercised its discretion in awarding back pay because Salveson presented no evidence showing that she was qualified to work as a paramedic for Gold Cross, or that she would have been hired by Gold Cross had no discrimination or harassment occurred. It further claims that regardless of the effect of the discrimination, Salveson would have been unable to work as a paramedic at Gold Cross because of her back and knee injuries.

¶ 32. We disagree. The court's conclusion that back pay is equitable and appropriate in this case is supported by evidence in the record indicating that Salveson would likely have been hired by Gold Cross had she applied. Mark Stansberry, an employee of Gold Cross who was responsible for evaluating candidates for employment and recommending candidates for hire, testified that Gold Cross had a training department and stressed community outreach. Stansberry also testified that he knew Salveson and would have recommended that Gold Cross hire her as an instructor or trainer if she had met the basic qualifications. Stansberry further stated that the basic qualifications for a position as a paramedic instructor or trainer were 2000 to 4000 hours of street experience, CPR instructor certification, and the possession of other instructor cards.

¶ 33. Nothing in the record indicates that Salveson would not have met the basic qualifications as set out by Mark Stansberry. Salveson was a nationally registered paramedic and had worked ample time (often 56 hours per week) to log the requisite hours of street experience. Former colleagues regarded her as a well-qualified paramedic. Stephen Smith, a paramedic

with Gold Cross, rated her skills as "above-average" and stated that he would prefer to work with Salveson, rather than with some other paramedics. Terence Stachovich, another Gold Cross paramedic, called her "a good partner to work with." Patrick Mackiewicz rated her skills as "[e]xceptional. At least well above average," and called her a "good partner to work with." Steven Morley, a paramedic who had worked with Salveson for Douglas County, testified that she was an "excellent paramedic." Even Richard Collyard called Salveson "a good paramedic" in his deposition. The circuit court therefore could have reasonably determined that had Salveson applied to work for Gold Cross, she likely would have been hired as an instructor.

¶ 34. Evidence in the record also supports the circuit court's finding that Salveson was unable to work for Gold Cross because of the psychological injuries she suffered as a result of sexual harassment and discrimination, and because Collyard was employed by Gold Cross. Salveson testified she did not apply to work for Gold Cross because Collyard was employed there. Dr. Pride, a licensed psychologist who assessed Salveson in February 1993, and treated her from 1993 until 1995, and again in 1998, also testified. He asserted that Salveson suffered from anxiety, depression, and post-traumatic stress disorder, and that the atmosphere at the Douglas County Ambulance Service was the catalyst to Salveson's conditions.[11] He further stated that he had determined in 1998 that Salveson would require three years of intensive therapy before she would be able to hold and work a full-time job.

---

[11] The County's expert, Dr. Marcus Desmonde, testified that Salveson appeared to suffer from post-traumatic stress disorder and other conditions, but asserted that her maladies were not caused by her work environment.

¶ 35. Based on this evidence, the circuit court could reasonably have determined that Salveson could not work for Gold Cross both because of her condition and because Collyard was employed there.

¶ 36. The County asserts that Salveson did not establish an entitlement to back pay, because she had previously claimed "total vocational disability" in her proceedings before the Department of Workforce Development (DWD).[12] This disability was based on the knee injury in 1993 that required surgery and her subsequent fall in 1995. The County claims that Salveson's application for duty disability benefits is fundamentally inconsistent with her assertion that she could have worked for Gold Cross. It contends that Salveson should therefore be judicially estopped from raising her argument in this case.

¶ 37. Judicial estoppel is an equitable doctrine, generally applied by circuit courts, that "precludes a party from asserting a position in a legal proceeding and then subsequently asserting an inconsistent position." *State v. Petty*, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996). The purpose of judicial estoppel is to "protect the judiciary as an institution." *Id.* at 346 (quoting *State v. Fleming*, 181 Wis. 2d 546, 558, 510 N.W.2d 837 (Ct. App. 1993)). In Wisconsin, the doctrine is used to prevent litigants from playing "fast and loose with the judicial system" by "maintain[ing] inconsistent positions during the course of the litigation." *Id.* at 354.

---

[12] Salveson's application for duty disability benefits and documentation of DWD's approval of her application are not part of the record in this case. The parties agree, however, that Salveson applied for duty disability in April 1995 and that her application was granted on November 1, 1995.

¶ 38. Three elements are required for a court to invoke the doctrine of judicial estoppel: (1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position. *Id.* at 348; *Harrison v. LIRC*, 187 Wis. 2d 491, 497, 523 N.W.2d 138 (Ct. App. 1994). Whether to invoke judicial estoppel is left to the discretion of the circuit court. *Fleming*, 181 Wis. 2d at 558. A reviewing court determines de novo, however, whether the elements of judicial estoppel apply to the facts of a given case. *Petty*, 201 Wis. 2d at 347.

¶ 39. Neither the circuit court nor the court of appeals explicitly addressed judicial estoppel in this case. However, both courts addressed the elements of judicial estoppel and both courts implicitly determined that the doctrine is not applicable to this case. The circuit court found that Salveson "became physically unable to work as a street paramedic because of injury," yet concluded that "she was qualified to work as a paramedic with Gold Cross either as a paramedic instructor or in some other limited capacity to accommodate her physical limitations." The circuit court therefore recognized the difference between working as a street paramedic and working as a paramedic instructor or as a limited capacity paramedic.

¶ 40. Similarly, the court of appeals did not use the term "judicial estoppel" but addressed the issue of whether Salveson had taken "inconsistent positions with regard to her ability to work." The court of appeals was "not persuaded that Salveson has been inconsistent." *Salveson*, 234 Wis. 2d 413, ¶ 19.

¶ 41. We agree with the determinations of the circuit court and the court of appeals and find that Salveson's positions are not clearly inconsistent, and therefore are not subject to judicial estoppel. *See Petty*, 201 Wis. 2d at 347. It is undisputed that the DWD determined that Salveson was physically unable to perform her duties as a street paramedic. To grant Salveson duty disability benefits, the DWD was required to find that while performing her duties, Salveson suffered an injury resulting in a permanent disability, and the disability caused her to retire, to have her pay reduced, or to be assigned to light duty.[13]

¶ 42. After receiving duty disability benefits, Salveson did not claim that she was physically capable of working as a street paramedic for Gold Cross. She claimed only that she believed she "would have been hired as an instructor" had she applied. It is undisputed that the duties and physical requirements of being a street paramedic differ from those required to be a trainer or instructor. We conclude that the positions taken by Salveson are not clearly inconsistent, that judicial estoppel is not appropriate on the facts of

---

[13] Wisconsin Stat. § 40.65(4) (1995–96) provided:

(4) A protective occupation participant is entitled to a duty disability benefit as provided in this section if:

(a) The employe is injured while performing his or her duty or contracts a disease due to his or her occupation;

(b) The disability is likely to be permanent; and

(c) 1. The disability causes the employe to retire from his or her job;

2. The employe's pay or position is reduced or he or she is assigned to light duty; or

3. The employe's promotional opportunities within the service are adversely affected if state or local employer rules, ordinances, policies or written agreements specifically prohibit promotion because of the disability.

this case, and that the circuit court properly exercised its discretion in not invoking the doctrine.

¶ 43. We further conclude that the County has not overcome the presumption that back pay should be awarded, and that the circuit court properly exercised its discretion in finding that had Salveson not suffered from the effects of sexual discrimination and harassment, she likely would have been hired by Gold Cross. We therefore affirm the decision to award Salveson back pay.

B. Front Pay

¶ 44. We turn next to the question of whether the circuit court properly exercised its discretion in awarding Salveson one year of front pay.

¶ 45. As we have noted, Title VII plaintiffs who prevail in unlawful employment discrimination suits are "presumptively entitled to full relief." *Hutchison*, 42 F.3d at 1044. Reinstatement is an equitable remedy that is explicitly enumerated in Title VII as appropriate for victims of unlawful employment discrimination. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998). Courts order reinstatement to make victims of discrimination whole, by putting them in the position they would have been in had the discrimination not occurred. *Albemarle Paper Co.*, 422 U.S. at 419 n.11.

¶ 46. However, while reinstatement is the preferred remedy for lost future earnings for victims of discrimination, it is not appropriate in some situations, such as when the employer and employee have an overly hostile relationship, or when no position is available. *Williams*, 137 F.3d at 952.

¶ 47. When reinstatement is not appropriate, courts often award front pay. *Id.* Front pay is used to compensate an employee for the difference in earnings between what the employee would have received in his or her former employment, and what he or she can expect to receive in his or her present and future employment. *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 n.8 (7th Cir. 1994). In other words, front pay is "a monetary award equal to the gain [the employee] would have obtained if reinstated." *Williams*, 137 F.3d at 952 (quoting *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993)).

¶ 48. Whether to award front pay is a discretionary decision for the circuit court. *Downes*, 41 F.3d at 1141. In making its determination, courts should consider factors including: "whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short," and "whether the plaintiff intended to work or was physically capable of working." *Id.*

¶ 49. The circuit court determined that reinstatement was not appropriate in this case due to the "circumstances," clearly referring to Gold Cross's taking over the ambulance service, as well as Collyard's employment with Gold Cross. The circuit court also stated that it would be inequitable for Salveson to be reinstated to her most recent position, as a file clerk for the Douglas County register of deeds, because she was a trained paramedic and should not be forced to accept a lesser position because of unlawful employment discrimination. The court therefore awarded Salveson one year of front pay in the amount of $29,744.

¶ 50. The County asserts that the circuit court erred in awarding front pay, by failing to consider whether Salveson could obtain comparable employment or whether she is physically capable of working. The County claims that Salveson could have obtained comparable employment at Gold Cross, but that she was unwilling to work there because of Mr. Collyard. Alternatively, it argues that even if Salveson could not have worked at Gold Cross, "it is difficult to imagine that there are no other employers within a reasonable distance of [Salveson's] residence that would have an interest in hiring her." Finally, the County asserts that Salveson could not have worked in any event because of her back and knee problems.

¶ 51. The circuit court properly exercised its discretion in awarding Salveson front pay. "[F]ront pay awards, while often speculative, cannot be unduly so. The longer a proposed front pay period, the more speculative the damages become." *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992). We do not find that the award of front pay in this case was excessively speculative. The circuit court considered the possibility of Salveson working for Gold Cross as a trainer or instructor, but determined that she could not do so because Collyard was employed by Gold Cross. The court clearly took into account Salveson's physical problems, but determined that even with those problems, she likely would have been hired by Gold Cross if she had applied for employment at Gold Cross.

¶ 52. The court did not specifically state that Salveson could not have obtained comparable employment other than at Gold Cross. However, a Title VII plaintiff is not required to establish that he or she could

not have obtained comparable employment.[14] Under Title VII, a victim of discrimination is presumptively entitled to full relief. *Hutchison*, 42 F.3d at 1044. Once a Title VII plaintiff establishes the amount of damages he or she suffered because of his or her employer's unlawful discrimination, the burden shifts to the employer "to show that the plaintiff failed to mitigate [his or her] damages or that the damages were in fact less than plaintiff asserts." *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989) (citing *Taylor*, 593 F.2d at 787); *see also Hutchison*, 42 F.3d at 1044.

¶ 53. The County did not establish at trial or in the post-trial motion hearing that Salveson could have found a position comparable to the one she held as a paramedic for Douglas County. Nothing in the record indicates that Salveson could have mitigated her damages by obtaining employment comparable to her position as a Douglas County paramedic, other than by working for Gold Cross. The testimony of Salveson and Dr. Pride makes clear that Salveson could not reasonably be expected to apply for work with Gold Cross, because Collyard was employed by Gold Cross. While the County argues that Salveson has shown no vocational disability as a result of the discrimination, the record contains Dr. Pride's testimony stating that the work environment at the Douglas County Ambulance Service was a catalyst for the post-traumatic stress disorder, anxiety, and depression from which Salveson suffers.

---

[14] A "comparable" job is one with "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status." *Rasimas v. Mich. Dep't. of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 (1982)).

¶ 54. Finally, we note that while Salveson sought three years of front pay, the circuit court awarded her front pay for only one year, limiting the speculation often involved in awarding front pay. *See McKnight*, 973 F.2d at 1372. The record supports the circuit court's conclusions that reinstatement was inappropriate, and that front pay should have been awarded. We therefore conclude that the circuit court properly exercised its discretion in awarding Salveson one year of front pay.

C. Offset of Back Pay and Front Pay for Disability Benefits

¶ 55. We next address whether the amount of back pay and front pay awarded to Salveson should have been offset by the disability payments she received. In its Amended Memorandum Decision, the circuit court ordered both Salveson's back pay and front pay offset as a matter of equity. On reconsideration, the circuit court amended its order, finding that Salveson's duty disability benefits had come from a source collateral to her employment. The court determined that under the collateral source rule, it would be inequitable to offset Salveson's back pay and front pay awards by her disability payments.

¶ 56. Under the federal collateral source rule, it is within the circuit court's discretion to determine whether benefits received from a source collateral to employment should offset an award of back pay or front pay. *Flowers v. Komatsu Mining Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999); *EEOC v. O'Grady*, 857 F.2d 383, 389 (7th Cir. 1988). In exercising their discretion, courts are guided by certain equitable principles. The

collateral source rule operates "not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice." *Flowers*, 165 F.3d at 558. "If the employer is the source of the funds at issue, then the payments can be deducted from the award." *Id.* However, if employees earn the benefits as part of their compensation, the payments should not be subject to an offset. *O'Grady*, 857 F.2d at 391.

¶ 57. The circuit court found on reconsideration that Salveson, as a member of the Douglas County Paramedics Association Union (paramedics union), had negotiated to receive eligibility for duty disability benefits, giving up salary increases and other benefits. The court concluded that although the County paid the employee contribution to the Wisconsin retirement system (WRS), Salveson had earned the benefit by giving up other compensation.

¶ 58. The court based its decision on affidavits and supporting documents submitted by Salveson establishing that the paramedics union made concessions in its 1992 negotiations with Douglas County, in exchange for the paramedics being classified as protective services employees. Salveson submitted affidavits from Steve Mackiewicz, the president of the paramedics union in 1992, and Steve Morley and William Kalin, paramedics union negotiators in 1992. Mackiewicz, Morley, and Kalin all stated in their affidavits that the paramedics union gave up wage compensation and sick leave time in order that the paramedics be classified as protective services employees. They further stated that the paramedics union's primary purpose in becoming protective services employees was to become eligible for duty disability benefits through the WRS. Kalin also submitted a copy of the pertinent portion of the paramedics union's con-

tract with Douglas County, documenting the concessions made by the union to become classified as protective services employees.

¶ 59. The County asserts that the circuit court erroneously exercised its discretion in not offsetting Salveson's award by the amount of her disability benefits. It acknowledges that under the collateral source rule, defendants should not receive a windfall for collateral benefits received by a plaintiff, and should not profit from benefits purchased by a plaintiff. However, the County asserts that it paid all premiums to the WRS for Salveson and that not offsetting her award would result in Douglas County taxpayers paying her twice. The County does not dispute that Salveson's disability benefits resulted from collective bargaining by the paramedics union, and therefore were essentially paid for by giving up potential compensation and benefits. It instead terms these facts "irrelevant" because Douglas County actually paid the premiums to the WRS.

¶ 60. We accept Salveson's undisputed assertion that she received disability benefits based on the paramedics union's collective bargaining. We find that Salveson earned and essentially paid for the benefits, and conclude that these benefits came from a source collateral to her employment. *O'Grady*, 857 F.2d at 391. While the County may have contributed funds from which the benefits were paid, it does not dispute that Salveson paid for some of the benefits through collective bargaining. "Funds supported in part—but not entirely—by contributions from the defendant are generally considered collateral." *Id.* at 390.

¶ 61. We conclude that Salveson's awards of back pay and front pay should not be offset by benefits she

529

received for her disability; she and other paramedics paid for those benefits by foregoing pay increases and other benefits. Douglas County should not benefit simply because Salveson also received collateral disability benefits. The County will not pay twice.

¶ 62. The court of appeals correctly observed that "the policy reasons for providing [disability] benefits for protective occupation participants are independent from the considerations involved in determining workplace discrimination. The County's contributions do not discharge any duty to maintain a suitable working environment." *Salveson*, 234 Wis. 2d 413, ¶ 21. They do not relieve the County from paying for illegal discrimination.

¶ 63. The circuit court properly exercised its discretion in determining that Salveson contributed to the retirement fund from which her disability benefits are paid, and that pursuant to the collateral source rule, her benefits should not be offset.

D. Damages Limitation

¶ 64. The two remaining issues presented in this case concern the damages cap imposed by 42 U.S.C. § 1981a(b)(3).[15] The parties disagree whether an

---

[15] 42 U.S.C. § 1981a(b)(3) provides:

(3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

award of front pay is subject to the damages cap, and whether the number of employees for purposes of the damages cap should be measured at the time the discrimination occurs or at the time the award is given. We turn first to the question of the applicability of the damages cap to awards of front pay.

¶ 65. The circuit court determined that the front pay it awarded to Salveson is not subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3). The court based its decision of the legislative history of Title VII, and noted that front pay was awarded before Title VII was amended in 1991 and therefore does not constitute compensatory damages awarded under § 1981a(b)(3)).

¶ 66. The court of appeals agreed with the circuit court's decision that front pay is not subject to the damages cap, also basing its determination on the legislative history of the statute, and on its finding that front pay was often awarded prior to the 1991 amendment to Title VII. *Salveson*, 234 Wis. 2d 413, ¶ 35.

¶ 67. After the circuit court and court of appeals issued their decisions in this case, the Seventh Circuit Court of Appeals determined that front pay is not subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3). *Pals v. Schepel Buick and GMC Truck, Inc.*, 220 F.3d 495, 499 (7th Cir. 2000).

¶ 68. The County urges this court to reject the analysis of the Seventh Circuit in *Pals*. It contends that

---

(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

under the plain language of 42 U.S.C. § 1981a(b)(3), front pay is "compensatory damages. . .for future pecuniary losses."

¶ 69. After the parties briefed and argued this case, the United States Supreme Court resolved the issue of whether front pay is included under the damages cap. In *Pollard v. E.I. duPont de Nemours Co.*, the Supreme Court held that "the statutory cap of § 1981a(b)(3) is inapplicable to front pay." 121 S. Ct. 1946, 1949 (2001). The Court found that courts may award front pay under § 706(g), *id.* at 1950, which, as amended in 1972, authorizes "any other equitable relief as the court deems appropriate." *Id.* It therefore concluded that "front pay is not within the meaning of compensatory damages in § 1981a(b)(3), and thus front pay is excluded from the statutory cap." *Id.* at 1951.

¶ 70. This issue is settled. The circuit court correctly applied § 1981a(b)(3) and properly excluded the front pay awarded to Salveson from the damages cap.

E. Size of Employer for Purposes of the Damages Limitation

¶ 71. The final issue presented is a question of whether the size of an employer for purposes of the 42 U.S.C. § 1981a(b)(3) damages cap should be measured at the time the discrimination occurs, or at the time the award is made.

¶ 72. The damages cap was enacted in the Civil Rights Act of 1991, so that the amount of compensatory and punitive damages awarded in Title VII cases would be dependent on the size of the company guilty of discrimination. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). "The bigger the company, the more it pays." *Id.*

¶ 73. It is undisputed that Douglas County had more than 500 employees from 1981, when the sexual harassment and discrimination against Salveson began, until 1993, but fewer than 500 from 1994 until 1998, when Salveson was awarded damages.

¶ 74. The question for the court concerns the effect of 42 U.S.C. § 1981a(b)(3), which limits "the sum of the amount of compensatory damages awarded. . .and the amount of punitive damages awarded" to:

> (C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and
> (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

¶ 75. The County asserts that the number of employees should be determined at the time damages are awarded, so that paragraph (C) applies to limit the amount of punitive and compensatory damages to $200,000. Salveson replies that the number of employees should be determined at the time the discrimination occurs, so that paragraph (D) applies to limit damages to $300,000.

¶ 76. The circuit court determined that "the only reasonable interpretation of this statute is that 'current or preceding calendar year' applies to the time when the discrimination or harassment occurred." The court of appeals cited 42 U.S.C. § 2000e(b), under which Title VII applies only to employers with "fifteen or more employees for each working day of each of 20 or more calendar weeks in the current or preceding year." *Salveson*, 234 Wis. 2d 413, ¶ 39. It noted that federal

courts interpret this parallel statute to apply to the year of discrimination, not the year of award, *id.*, and concluded that Congress did not intend for courts to determine the applicability of Title VII based on the year of the discrimination, and then to apply the damages limitation based on the year it awarded damages. *Id.* at ¶ 40.

¶ 77. The County claims that the statutory language is clear and unambiguous, referencing the time of the award, not the time of the harassment. It asserts that since no award is given at the time of the discrimination, the term "current or preceding year" must refer to the time the award is given. The County distinguishes the reference to "current" year in this statute from identical language in 42 U.S.C. § 2000e(b), stating that § 2000e(b) relates to coverage, not to awards. It cites no precedent supporting its position, but stresses that public policy would best be served if companies with more employees face a larger damages cap, than that faced by companies with fewer employees.

¶ 78. The Fifth Circuit Court of Appeals addressed this issue in *Vance v. Union Planters Corp.*, determining that "current" year in 42 U.S.C § 1981a(b)(3) refers to the year the discrimination took place, not to the year damages are awarded. 209 F.3d 438, 446 (5th Cir. 2000).

¶ 79. In *Vance,* the employer argued that "current" year refers to the year the discrimination occurred, while the victim contended that "current" year refers to the year the award was given. *Id.* The district court agreed with the victim that "current" year means the year damages are awarded. *Id.* The Fifth Circuit reversed, stating that "sound policy analysis" supports its reading of the statute. *Id.* "The best reason to use 'the year of occurrence' is that any other

interpretation allows parties to engage in gamesmanship by structuring companies, or timing the progress of lawsuits, to maximize gain or to minimize loss." *Id.* The court also stated that part of the reason that the damages cap allows greater damages for larger employers is that those employers are better able to prevent discrimination by use of "specially trained human-resource personnel." *Id.*

¶ 80. While the Fifth Circuit is the only federal circuit to specifically decide this issue, the Seventh Circuit has implicitly determined that "current" year means the year of the discrimination. In *Hennessy*, the employee was terminated from her position on April 7, 1992. 69 F.3d at 1348. The employee's case was heard in 1994, and damages were awarded. *Id.* at 1347, 1349. Under the County's interpretation of the statute, the relevant time period for determining number of employees would be the year of the award (1994) and the preceding calendar year (1993). However, the Seventh Circuit determined that damages were limited pursuant to 42 U.S.C. § 1981a(b)(3) based on the number of employees in April 1992, when the discrimination occurred. *Id.* at 1354–55. The court therefore implicitly interpreted 42 U.S.C. § 1981a(b)(3) as applicable to the year the discrimination occurred and the preceding calendar year.[16]

---

[16] Similarly, in *Williams v. Pharmacia, Inc.*, the Seventh Circuit Court of Appeals affirmed a district court order which had limited the sum of compensatory and punitive damages to $300,000 pursuant to 42 U.S.C. § 1981a(b)(3). 137 F.3d 944, 947–48 (7th Cir. 1998). The plaintiff (Williams) had been discharged in August 1994, and after prevailing in a sexual discrimination trial, she was awarded compensatory and punitive damages by the jury on March 7, 1996. *Williams v. Pharmacia Opthalmics, Inc.*, 926 F. Supp. 791, 792–93 (N.D.

¶ 81. Our research has revealed no case, and the County has cited no case, in which a court has either implicitly or explicitly interpreted "current" year in 42 U.S.C. § 1981a(b)(3) as referring to the year in which the award was given. We are not convinced that Congress intended "current" year to refer to the time the discrimination occurs in 42 U.S.C. § 2000e(b), but to the year the award is given in § 1981a(b)(3). We agree with the court of appeals in this case, and the Fifth Circuit in *Vance*, that applying the damages cap at the time damages are awarded could lead to manipulation of the number of employees and the timing of a lawsuit to alter the amount of damages for which an employer may be liable. *Salveson*, 234 Wis. 2d 413, ¶ 40 n.20; *Vance*, 209 F.3d at 446.

¶ 82. We conclude that the size of the employer for purposes of the 42 U.S.C. § 1981a(b)(3) damages cap must be measured at the time the discrimination occurs. The discrimination in this case occurred from 1981 until 1995. The parties agree that Douglas County had more than 500 employees for each of 20 or more weeks in 1991, 1992, and 1993. We conclude that the circuit court therefore properly determined that Douglas County was an employer with more than 500 employees, and correctly limited compensatory and punitive damages to $300,000, pursuant to 42 U.S.C. § 1981a(b)(3).

Ind. 1996). The district court limited the total of compensatory and punitive damages because the employer "had between 700 and 800 employees *in the two years immediately before Ms. Williams's discharge.*" *Id.* at 793 (emphasis added).

### III. CONCLUSION

¶ 83. We hold that an award of front pay is excluded from the cap on damages imposed by 42 U.S.C. § 1981a(b)(3), and that the number of persons employed by an employer for purposes of the damages cap, is properly determined at the time the discriminatory act occurs. We conclude that the circuit court properly exercised its discretion in awarding Salveson back pay and front pay, and in determining that the awards should not be offset by the duty disability payments she received. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.